HEARD APRIL TERM, 1876.

LIVINGSTON *vs.* WELLS.

A settlement between guardian and ward—father and daughter—made as soon as the ward became of age, sustained by the Court as just, fair and proper, although no account was rendered nor statement of the amount due made, and although the ward received from the surety of her guardian, who was her uncle, by way of compromise, railroad bonds to an amount much less than the sum actually due by the guardian,—it appearing that the estate of the ward had been lost without the fault of the guardian and that he was insolvent.

Simple interest only charged against a trustee upon the balance due in 1859, at the foot of his account, although it was claimed that the interest due at the end of each year bore interest.

The general rule that interest, as against a trustee, runs only from the end of the year applied.

BEFORE CARPENTER, J., AT RICHLAND, JANUARY, 1876.

These were two actions by Ella A. Livingston against Jacob H. Wells and also against Thomas J. Robertson, as executor of John Caldwell, deceased.

The case was as follows:

In 1859 the plaintiff, then an infant, was entitled to two funds— one an interest in the estate of her deceased mother, in which she, as a distributee of her mother, had an absolute estate, and the other an interest under the will of her deceased uncle, William P. McConnel, in which she had an estate for life for her sole and separate use with limitations over.

On the 19th day of March of that year the defendant Jacob H. Wells was duly appointed guardian of the estate of the plaintiff, and gave bond as such guardian in the penal sum of $36,000, and on the same day he was duly appointed trustee of the estate of his daughter, under the will of her said uncle, and gave bond as such trustee. John Caldwell and Richard Anderson were the sureties of Jacob H. Wells on both bonds. John Caldwell died in 1870, leaving a considerable estate, and also leaving a last will and testament, of which the defendant, Thomas J. Robertson, was the executor.

Richard Anderson had died some time before insolvent and leaving no estate.

The plaintiff became of age on the 8th day of September, 1869, and six days thereafter she executed and delivered to her father a receipt, of which the following is a copy:

" Received, Columbia, September 14, 1869, from Jacob H. Wells, $25,099.32 in full payment of all balances, dues, moneys and demands of every nature and kind whatsoever as my guardian to this date, I now being of the full age of twenty-one years, and said guardianship having ceased. This receipt is an acquittance in full to said guardian of all liabilities whatsoever on account of said guardianship.

"ELLA A. WELLS."

"Attest: J. P. THOMAS."

The object of the action in one case was to set aside the above receipt as fraudulent and void, and for an account by the defendants of the guardianship estate of the plaintiff, and in the other for an account of her trust estate.

After the said receipt was executed, Jacob H. Wells applied to the Court of Probate for Richland County for a discharge from the duties of his office as guardian of his daughter, and on the 16th day of October of the same year that Court made its final order for his discharge.

The defendant, Thomas J. Robertson, filed answers in both cases. He denied all the charges of fraud made in the action for an account of the guardianship estate, and he set up the receipt as a defense to both actions.

The cases were referred to a Referee, who took testimony and reported the same to the Court. He also reported that the amount due by the guardian to his ward on September 8th, 1869, on account of the guardianship estate was $20,043.22, and that the defendant, Jacob H. Wells, had received, on the 1st day of April, 1859, as the trustee of his daughter, from the estate of William P. McConnell, deceased, the sum of $3,685.33. The other material facts of the case are stated in the circuit decree and the opinion of this Court.

The circuit decree is as follows:

CARPENTER, J. These cases are between the same parties, and were heard by me at the same time, without a jury. It appears that in March, 1859, the defendant, Jacob H. Wells, was appointed guardian of the estate of his daughter, Ella A. Wells, the plaintiff, and was at the same time appointed trustee of her estate under the provisions of the will of William P. McConnel, deceased. In case of Ella dying without issue, the trust estate is subject to limitations set forth in the will.

In each estate Wells gave a bond, with John Caldwell and Richard Anderson as sureties. Richard Anderson is dead, and his estate insolvent. John Caldwell died, leaving the defendant, Thomas J. Robertson, the executor of his will. Both the guardianship and trust estates became lost in the hands of Wells, and these actions are brought to make the estate of John Caldwell respond. The loss of these estates is shown to have been owing to the results of the civil war, before which Wells was possessed of ample means. Ella became of age on 8th September, 1869, and was married to J. K. Livingston on 30th November, 1871. Upon the plaintiff becoming of age she was spoken to by her father, Wells, regarding the loss of the estate by the war, and he told her that Caldwell would

give her $10,000. Caldwell called upon Ella and gave her $10,000 in railroad bonds. On 14th September, 1869, the plaintiff signed a receipt which purported to be a full acquittance of all liability of her father as her "guardian," and on account of his "guardianship." Notice that Wells would apply for a discharge before the Judge of Probate was afterwards published, and on the 16th October, 1869, Wells received his final discharge from the Judge of Probate.

In November, 1873, the plaintiff instituted her action against Caldwell's executor upon the guardianship bond, having, in September, 1872, brought suit against the same party on the bond of Wells as trustee.

The plaintiff impeached the settlement on the ground that advantage was taken of her ignorance, inexperience and her filial relations, and that the settlement was an unfair one. The testimony has failed to satisfy me of her ignorance of any material fact, and there was certainly no misrepresentation made her. She was advised that her father had, on account of the war, lost her estate, and that the bonds were to be given her as a *compromise* in settlement. She certainly knew that $10,000 was not the amount due her; that it was a compromise—so her father informed her; and the amount stated in the receipt informed her that she was discharging a liability of $20,000. It may be granted that she knew not the exact figures, but even in this particular the sources of information were pointed out to her, and any ignorance in this respect was voluntary.—*McLure* vs. *Ashley*, 7 Rich. Eq., 444; *Kane* vs. *Bloodgood*, 7 Johns. Ch., 90 and 114; *Maxwell* vs. *Kennedy*, 8 How., 220.

In the language of Taney, C. J., in the last case: "If she remained ignorant, it was because she neglected to inquire." I cannot see where any advantages were taken of the plaintiff. She was an intelligent and well educated lady. No undue influence was brought to bear upon her; no urgent appeals were made to her; and neither Wells or Caldwell manifested any disposition to take advantage of her. Her father had been unfortunate, had lost in a general calamity, had been kind to her, and had given her the advantage of a fine education. The proposition itself of a compromise was one at that time not unusual between sharp business men. Now, under all the circumstances, can it be said that the settlement

itself was not a fair one, and, considering the relations of the parties, one creditable to all?

Was it not morally right?

It is urged that she did not know that she was discharging Caldwell as surety. Suppose this were so—can it be said she did not know that she was discharging the principal?

All the circumstances were such as to give her the information. She knew the bonds were the property of Caldwell. She was told that what Caldwell was to give her was "some money that was mine," (hers). She told Mrs. Blakely that she had had a settlement with her uncle, (Caldwell,) and had compromised with him; and Wells says that he told her that Caldwell was his *security*. That she had this information she may well have forgotten, but it would be strange that she could have thought otherwise at the time. But if the settlement was proper as to the principal, and the surety resorted to no unfair means to bring about the settlement, there is no reason why it should not stand as to the surety. The testimony shows that Mr. Caldwell at this time was not in a condition of body or mind to drive sharp bargains; and his relations to Ella were such that we cannot infer that he had any disposition to act unfairly with her. His desire seemed to be to settle up his affairs in this world, in anticipation of soon being called to another.

That the bonds were subsequently lost by Ella's father, or that her husband was not satisfied when he informed himself of all the facts, cannot affect the fairness of the settlement at the time it was made. The fact that the plaintiff remained satisfied for years after the settlement until her marriage, and until after Caldwell's death, are good reasons why this Court should not disturb the settlement, unless a much stronger case had been made out by the plaintiff.

The next question is to inquire what was compromised in the settlement. On this point I find nothing to justify me in the conclusion that the parties themselves had in view the trust estate also. The receipt only specified the guardianship, and the plaintiff had not the power to discharge her father as trustee.

The trust estate concerned others as well as herself. I therefore regard the settlement as discharging Wells as *guardian* only.

I therefore find as matters of fact the conclusions hereinbefore stated; and, as matters of law:

1. That, under all the circumstances proven, the settlement made with the plaintiff upon her maturity was one fair and proper in law and now binding on her.

2. That the defendant, Jacob H. Wells, and the estate of John Caldwell as his surety, are liable for the whole amount of the trust estate.

*It is therefore ordered :*

1. That the complaint in the case against Jacob H. Wells as guardian and Thomas J. Robertson as executor be dismissed.

2. That the defendant, Thomas J. Robertson, as executor of the will of John Caldwell, deceased, do pay over to such person as may be appointed trustee in the place of Jacob H. Wells the sum of three thousand six hundred and eighty-five dollars and thirty-three cents, ($3,685.33,) with interest thereon, calculated annually, from the first day of April, 1859, to the day of computation. That is to say: the first year's interest, due on the first day of April, 1860, to be considered an interest-bearing fund until the day of computation, and so on from year to year as the interest falls due, less two and a half per centum commission upon the amount of interest.

*It is further ordered,* That the Honorable C. P. Townsend be appointed trustee of the estate of Ella A. Livingston in the room and instead of Jacob H. Wells, upon his entering into bond, with at least two good sureties, in the sum of $20,000, conditioned for the faithful performance of his duties as trustee as aforesaid, and in accordance with the provisions relating thereto contained in the last will and testament of William P. McConnel, deceased; said bond to be approved by the Clerk of the Court of Common Pleas of the County of Marlboro.

The plaintiff, Ella A. Livingston, excepted to so much of the decree as affects the action on the guardianship bond, and appealed therefrom on the grounds:

1. In that it holds that the testimony does not show that the plaintiff was ignorant of any material fact necessary to enable her to make the settlement; and that there were no misrepresentations by the defendants, or either of them, or undue influence.

2. In that it holds that she knew it was a compromise, and that, the sources of information being pointed out to her, if she remained in ignorance it was voluntary; that she was subjected to no undue influence, no urgent appeals were made to her, and neither Wells nor Caldwell manifested any disposition to take advantage of her; that, under all the circumstances, the settlement was fair, and, con-

sidering the relations of the parties, creditable to all and morally right.

3. In that it holds that she knew that she was discharging the principal and surety, and that the settlement was a proper one, both as regards the principal and surety; that Mr. Caldwell was not in a condition of mind or body to desire sharp bargains, and, from his relations to the plaintiff, we cannot infer a disposition to act unfairly with her; and the fact that she remained satisfied for years after the settlement, until her marriage, and until after Caldwell's death, are good reasons why the Court should not disturb the settlement.

4. In that it finds as matters of fact the conclusions hereinbefore stated, and in said decree more fully set forth.

5. In that said decree finds as matter of law that, under all the circumstances proven, the settlement made with the plaintiff upon her majority was one fair and proper in law and now binding on her, and dismisses the complaint.

6. In that the said decree does not find as a fact that the plaintiff, having been kept in ignorance concerning her property, was, on the night before she attained her majority, informed by her father that her property had been lost by the results of the war, but that her uncle, John Caldwell, would on the next day give her $10,000 in South Carolina Railroad bonds, the interest on which would support her, and thus impressed her with the idea that this was all she could get or was entitled to.

7. In that said decree does not find as a fact that on the very day the plaintiff became of age her father and uncle, as guardian and surety, availed themselves of her ignorance, inexperience and implicit confidence to impose upon her a settlement unfair, unjust and unconscionable; that neither of them exhibited to her any statement of accounts showing the amount due to her or explained the nature of their liability to her, thus withholding from her all opportunity to understand her rights; that she was not allowed the benefit of legal counsel, the advice of disinterested friends or information sufficient to satisfy a mind of the most ordinary business capacity of the fairness of the transaction, but she was hurried with unbecoming haste to its consummation by those who were bound in law, in morals and by the ties of blood to deal with the most perfect fairness and good faith.

8. In that the decree should have found as a matter of fact that the plaintiff, at the time of signing the receipt, was left in almost total ignorance of the character of her estate, whence it came, what was the amount, or what were her rights therein, or what the duty and liability of her guardian and his surety, and was first fully informed of the facts by her husband after marriage; that, though she was intelligent, she was, nevertheless, gentle, amiable and uncommonly dutiful, and under the dominion of her father and uncle at the time of signing the release.

9. In that the decree should have found as a fact that the guardian, acting under the advice of his surety, made no separate investment of his ward's funds, but, mingling them with his own and using them in trade and speculation, the estate became lost from maladministration and not from the results of the war; that no return deserving mention was made until after the war, and just before pretended settlement, when the guardian, under the advice of his surety, made a return, covering a series of years, in which, to save his surety and at his request, improper charges for maintenance were made and material mistakes in addition, to wit, the error of $1,000, occurred.

10. In that the decree should have found as a fact that the settlement pretended to have been made with the plaintiff has none of the elements of a compromise; but that the acceptance by a young lady, in her father's house on the day she became of age, at the request of her father and uncle, of $6,000 or $8,000 in satisfaction of a debt of perhaps $30,000, and that from a debtor abundantly able to pay, should rather be termed an imposition and a gross fraud than a compromise; that such a settlement was not legally or morally right, but immoral and contrary to good conscience and equity.

11. In that the decree should have found that the delivery of the railroad bonds by Mr. Caldwell to the plaintiff without explanation, and when he knew that they would fall into the hands of the guardian while yet the ward was not emancipated from his control and dominion, and while in fact he was not in any manner discharged, and which said bonds did in fact go into said guardian's hands and become lost to the ward, was no payment and ought not *pro tanto* to relieve them, or either of them, from accounting for them.

12. In that the decree should have found, as a matter of law, that the settlement having been made by the guardian and his surety, who were possessed of a high degree of business tact and large experience, with the ward upon the day she reached her majority and while she was inexperienced in business and unacquainted with her rights, in which settlement unnecessary sacrifice is made by her and great benefit and advantage accrues to the guardian and surety, a *prima facie* case of actual fraud and imposition is presumed, which presumption is not rebutted by the facts but rather confirmed, *wherefore* the decree should have been to reopen the settlement and order an accounting.

13. In that the findings of fact and the conclusions of law drawn therefrom in the said decree are unsupported by the testimony, contrary to the evidence and in plain disregard of the well-established principles of law and the uniform practice of our Courts in enforcing good faith and fair dealing between guardians and their wards, the principle of law being that, " to avoid a discharge executed by a ward to his guardian shortly after he has reached his majority, it is not necessary that there should be proof of actual fraud even if full opportunity is afforded to examine the account; yet without willful intent to mislead there may be such a want of communication, both in regard to them and the securities transferred, as would preclude the Court from giving it effect as an estoppel."

The defendant, Thomas J. Robertson, also excepted to the decree, and appealed therefrom on the grounds:

1st. That simple interest only should have been charged on the trust fund and not annual interest.

2d. That interest should have been charged, not from the 1st day of April, 1859, but from the 1st day of January next succeeding.

*Hudson & Newton,* and *McMaster & LeConte,* for the plaintiff.

*Rion,* for the defendant, Robertson.

March 19, 1877. The opinion of the Court was delivered by

WILLARD, A. J. The appeal from the decree of the Circuit Court in the case against Wells, as guardian, will be first considered. The facts of the case are sufficiently stated in the opinion of the Circuit Judge, and need not be restated at this time.

The material facts ascertained by the circuit decree are as follows:

1. That the plaintiff possessed at the time of making this settlement, sought to be set aside, sufficient knowledge of the nature of her rights and of the circumstances of the case to enable her to act understandingly, and that her action in the premises was not affected by any misrepresentation or undue influence.

2. That the settlement was in itself a fair one, and, considering the relations of the parties, creditable to all. He consequently determined, as matter of law, that, under all the circumstances proven, the settlement made with the plaintiff upon her maturity was one fair and proper in law, and now binding upon her.

We are called upon to adjudge that these conclusions of fact and law are unsupported by the evidence and in violation of rules of law and equity applicable to the case. We will first consider the grounds urged for reversing the conclusions of fact. In order to set aside the conclusions of the Circuit Court as to the force and effect of evidence, upon an appeal in cases of equitable cognizance, it is necessary to show that such conclusions are inconsistent with or unsupported by the clear force of the evidence from which they are drawn. It is not sufficient ground to interfere with determinations as to matters of fact that the appellate Court, had it heard the case upon the evidence, in the exercise of original jurisdiction, would have drawn different conclusions of fact than those drawn by the Circuit Court. It must appear that the conclusions of the Circuit Court are clearly wrong. The presumptions in favor of the correctness of the circuit decree must be completely rebutted on considerations arising from the evidence, if it appears that there was contradictory testimony, in order to reconcile which the character and position of the witnesses must be considered as presenting a question of credibility. The circumstance that the Circuit Court is primarily authorized to determine the questions of fact, and the additional circumstance that that Court ordinarily possesses more ample means for arriving at a just conclusion as to the degree of weight that ought to be ascribed to disputable testimony, induces the appellate Court, ordinarily, to defer to the judgment of the Circuit Court. If it appears that conclusions of fact inferentially drawn from the testimony enter into the determinations as to matters of fact, the appellate Court usually leaves these conclusions undisturbed, unless found to be inconsistent with inferences that are

regarded by the Court as irresistibly arising from such evidence. In a word, the clear result of undisputed testimony must point to a conclusion different from that which the Circuit Court has drawn from it before it will be disturbed on appeal.

The foregoing principles governing appeals as to matters of fact have so often been enunciated by this Court that it is not necessary to refer particularly to the cases in which they have been considered.

It is contended that the conclusions of the Circuit Judge, that the plaintiff, at the time of making the settlement in question, possessed sufficient knowledge of her rights and of the state of her affairs to act understandingly in the matter, is not supported by the evidence. The testimony on this subject is certainly contradictory. The different statements made by the plaintiff and her father, bearing on the question of the extent of her knowledge, was such that it was particularly within the province of the Circuit Court to determine the preponderance of proof. A question of credibility, involving the accuracy of the memory of the respective witnesses, and more or less affected by their respective interests in the controversy, was clearly presented to the Circuit Judge. His conclusions on such matters, as we have already seen, will not ordinarily be disturbed. There is no reason to doubt that the Circuit Judge gave full and impartial consideration to all the circumstances that have a bearing on this and other similar questions arising out of inconsistencies between the statements of different witnesses bearing upon the same subject. No sufficient reason is urged for disturbing his conclusions as to the testimony that ought to receive the greater weight in the judgment of the Court.

A question of law is ultimately associated with the questions of fact just noticed, namely: To what extent ought the plaintiff to have been informed to enable her to act understandingly? Should we conclude that the Circuit Judge had erred in applying the proper measure to the extent of information regarded as necessary or proper to be conveyed to her under the circumstances in order to enable her fairly to judge as to her interest in the settlement, we would be bound to apply the true measure to the case.

The amount of information that should have been conveyed to her by her father must depend on the character of the motive that prompted her in making the settlement.

That motive was clearly either a desire to conform to her father's wishes or to relieve him of part of his liability, supposed to have arisen from his misfortunes, or to settle by a compromise a disputed claim. It is probable that all of these elements extend more or less into the motive that actuated her.

It is very urgently contended that in no respect does the idea of a compromise enter into the settlement; but if the circumstances are properly considered, it will appear that the parties had reasonable ground to suppose, at the time of making the settlement, that a compromise was appropriate. It is far from clear that the guardian was at that time responsible for the whole estate of his ward that came originally into his hands. It has been assumed in argument that the evidence shows that, as guardian, he had mixed up the moneys of his ward with his own and used them for his own profit. The evidence falls far short of sustaining such a conclusion. The testimony of the guardian shows that he invested the plaintiff's money in stocks,—bank, railroad, &c.,—and that the securities became valueless through the general failure of corporations at the close of the late war. It is true that the investment was alleged to have been made in his own name, but that is not decisive, for he may have placed the evidences of such investment for the benefit of his ward and held them apart from the risks of business for all that appears. Nor do the circumstances under which the investments were made appear so as to enable the Court to say that the investments of themselves constituted a breach of trust on the part of the guardian. Nor can it be said that the guardian was bound in this case to volunteer proof that he had not been guilty of a breach of trust in the mode of investment, for no such breach of trust is charged in the complaint; all that is said is that "said large sums of money have been ever since in the hands and under the control and management of the said guardian unaccounted for except as hereinafter shown." The burden of the complaint is failure to account, and yet the plaintiff seems to assume that a decree for the whole original amount of her estate is a matter of course against the estate of her father's surety without going through what is essential to our understanding of the actual liability of her father as her guardian. It is enough to say that there is not enough on the face of the pleadings and evidence to enable the Court to say that at the time of the settlement there was an undisputed case of liability on the part of the guardian and his surety to the full ex-

tent of the ward's estate that originally came into the guardian's hands. If this view is correct, there was probably in the minds of the parties an idea that there was something unascertained and doubtful in the liability of the parties, and, therefore, something that invited compromise. The evidence before us does not warrant us in saying that the Circuit Judge erred in holding that the plaintiff possessed sufficient knowledge of her affairs to make a settlement understandingly. If the case be regarded as one of a compromise of a diputable debt, no particular information was requisite beyond that of knowing approximately the amount of her estate, the fact that it had been swept away by a disaster common to those around her, and that the existence of any mode of replacing the *corpus* of her estate was doubtful. We have no reason to question the sufficiency of her knowledge in these respects. If, on the other hand, her sole motive was to conform to her father's wishes, or to relieve him from partial responsibility for a loss which she doubtless believed he had incurred without his fault and through a general disaster, then no particular information as to the state of facts can be regarded as essential to carrying out a purpose resting wholly on benevolent or dutiful feelings.

The evidence does not warrant any conclusion inconsistent with the finding of the Circuit Court that no misrepresentation or undue influence was employed to control the action of the plaintiff in the premises. We might go farther, and say that there is no evidence that could warrant any other conclusion, but we are not called upon to make such a determination. The conclusion of the Circuit Judge that the settlement was a fair one, and, considering the relations of the parties, creditable to all, is objected to. I concur fully in the view of the Circuit Judge in this respect. Assuming that the case, as presented to the mind of the plaintiff, was this,—that her father had lost her estate without fault on his part and through the course of public events alone, and that she could only look to her uncle to make good to her such loss,—it was the natural dictate of a good heart to relinquish all advantages derived from such a source, or at least to accept but a part of what might be legally demanded. If she regarded her uncle as voluntarily offering to replace part of what was lost, it was natural that a mind thus influenced should prompt her to treat the offer as proceeding from the bounty of her uncle and to release all further demands upon him. When it is considered, in addition to this, that the claim

against her uncle was disputable, as we are bound from the evidence to say it was, considerations of prudence would naturally become mingled with those arising from kindly feelings and suggest the very course pursued. If it was right for the plaintiff to have acted as she did from the promptings of her own mind, it was right for her father to strengthen that motive by his counsel in the expression of his wishes. Whether such a course of conduct would be appropriate on the part of one not within the parental relation need not be considered. Equity cannot ignore the existence of such prompting nor declare that to be inequitable which is prompted by the best feelings of our nature. It is true equity is watchful that feelings of this character are not abused or misdirected or unreasonably indulged; but where, as in the present case, no such circumstance appears, it withholds its hand from interfering with acts springing from such motives. The conclusion drawn by the Circuit Court from the facts already adverted to appears to be correct. He holds that, under all the circumstances proved, the settlement made with the plaintiff upon her maturity was one fair and proper in law and now binding upon her. It is contended, however, that the fact that this settlement was made the day after the plaintiff arrived at maturity deprives it of the character of an ordinary contract made with a person of full age. It is well settled that for some purposes the relation of guardian and ward is deemed to continue for some appreciable time after the moment at which the ward arrives at maturity, on the idea that the effect of the past legal relation, as it regards the duty of protection on the one hand and confidence on the other hand, cannot be instantaneously obliterated.—*Archer* vs. *Hudson*, 7 Beav., 351. When a person *in loco parentis*, such as a guardian, deals with his ward for his own advantage immediately after such ward comes of age, the presumption is against the fairness of the transaction, and the person claiming such advantage must show, affirmatively, that it is in all respects fair.—*Archer* vs. *Hudson; Johnson* vs. *Johnson*, 2 Hill Ch., 277. It is not difficult to refer the principles of this decision to the familiar rule of equity that a trustee shall make no profit to himself out of the trust estate,—that rule being considered as giving rise to a presumption of undue influence for such a time after the legal termination of the fiduciary relation as should appear to be sufficient for the purpose of removing from the mind of the ward the influences incident

to such past relation. The rule that forbids personal advantage being taken of his confidential relation by one assuming or charged with advising another on matters affecting the pecuniary interests of the latter appears to result from assimilation to the principle just stated.—*Huguenin* vs. *Basely*, 13 Lead. C. E., 95. As one of the incidents of the relation of guardian and· ward is that the guardian should act in an advisory capacity to the ward, the Court looks to see that the duty of the relation in this respect has been fully performed. This duty necessarily involves that of putting the ward in possession of all the facts and circumstances essential to an understanding of any case in which he may be called upon to exercise judgment, and whether this duty has been fully performed is a proper subject of legal inquiry. If there has been a failure in this respect, the guardian is deprived of any benefit he might otherwise have derived from his dealings with his ward.—*Womack* vs. *Austin*, 1 S. C., 421. In the cases in which a presumption of unfairness has been applied a direct benefit to the person seeking to uphold the transaction has been a feature.—*Archer* vs. *Hudson*, 7 Beav., 351; *Huguenin* vs. *Baseley*, 3 Lead. C. E., 95; *Womack* vs. *Austin*, 1 S. C., 421; *Johnson* vs. *Johnson*, 2 Hill's Ch., 277; *Gibson* vs. *Jegis*, 6 Ves., 266; *Heron* vs. *Heron*, 2 Atk., 167; *Blackburn* vs. *Edgeley*, 1 P. Wms., 600; *Hatch* vs. *Hatch*, 9 Ves., 292.

It is evident that the present case cannot be regarded as one in which the guardian claims any benefit arising from the relinquishment of any part of the plaintiff's demands against her father's surety. The guardian was hopelessly insolvent. If his motive can be gathered from his subsequent conduct, it would appear to be of an opposite character. As it appears that he used the property obtained through the settlement as the means of obtaining credit to go into business, if anything is to be inferred from this fact bearing on his interest in the settlement it would lead to the conclusion that he was interested in his daughter's receiving as much as possible from her uncle. But, however that may be, the case discloses the circumstances of the transaction sufficiently to enable the Court to see that the transaction was fair and equitable, and, should it be considered that a presumption of unfairness attached to the transaction apart from explanation, the facts as developed must be regarded as sufficient to do away with the force of such presumption.

The conclusions of the Circuit Judge, as it regards the effect of the settlement with the guardian on the executor of his surety, appear to be correct.

The appeal taken by the executor of the surety relates to that part of the decree which prescribes the mode of computing interest on the trust fund and relates to the complaint against Wells as trustee. The decree directs interest to be "calculated annually from the 1st day of April, 1859, to the day of computation. That is to say, the first year's interest due on the 1st day of April, 1860, to be considered an interest-bearing fund until the day of computation, and so on as the interest falls due, less two and a half per cent. commissions upon the amount of interest."

This appeal gives rise to two questions—first, what is the rule of calculating interest applicable to the case? and, second, when should interest commence to run? It is necessary to conclude that so much of the decree as ascertains the facts with regard to the disposition of the moneys belonging to the plaintiff in the hands of Wells is applicable both to the estate of the plaintiff held by him as guardian and that held by him as trustee. In other words, that the same events that are to be deemed the cause of the loss of the estate held by him as guardian are to be equally regarded as the cause of the loss of the trust estate. Under these circumstances it might have been a question, had an appeal been taken for that purpose, whether the findings of the decree and the evidence authorized any decree against the surety, or even as against the guardian, for the want of a clear allegation and proof of a breach of trust, in view of the proof as to investments and as to the actual cause of loss; but that question is not before us, as the only feature of the decree appealed from by the executor of the surety is that relating to interest. These facts have, however, an important bearing on the question of interest. The rule of law is clearly settled in this State that only simple interest, qualified as hereinafter stated as to credits for payments, can be charged against a trustee unless it appears that he has dealt improperly with the interest-bearing fund. No such charge can be made out from the facts found by the decree upon the evidence, and, the qualifications of the rule as to payments being inapplicable, as will subsequently appear, simple interest alone can be claimed. In *Black* vs. *Blakeley*, (2 McC. Ch., 1,) it was settled that, as a general rule, trustees, and

and others in a like relation, are not to be subjected to the payment of interest upon interest, according to the method of computing by annual rests, although the existence of exceptions is recognized, as where one mingles trust funds with his own and subjects them to the risks of trade for his own profit; or where there is a direction to accumulate a fund, which has been disregarded. A qualification of the general rule was also recognized, as where the trustee is to be credited with payments made, in which case it is to be presumed that balances of interest in his hands were first applied to make such payments before the interest-bearing sum was employed for that purpose. This latter qualification had the effect to make interest an interest-bearing fund only where it was, in fact, or should have been, employed to discharge current demands; but in this case it was only in an indirect sense that the interest became an interest-bearing fund, for, in point of fact, the computation of interest was confined to the *corpus* of the estate; but as that was, in effect, kept intact by taking from the interest fund what was necessary to meet current demands, the interest then employed was, in a certain sense, productive. This rule was approved in *Wright* vs. *Wright*, (2 Hill Ch., 185.) The duty of keeping interest balances in a separate account, so that compounding should be avoided, as a general rule, was clearly pointed out in *Derrick* vs. *Edin*, (3 DeS., 241.) The rule in *Black* vs. *Blakeley* was followed in *Brown* vs. *Vixyard*, (Bail. Eq., 460.) In *Davis* vs. *Wright*, (2 Hill, 560,) Judge O'Neall, referring to the rule of computation laid down in *Black* vs. *Blakeley*, says that he has no doubt that where accounts are made up under it, and the other familiar rule to apply first the interest of each current year as the balance of the preceding year to the expenditures, that it will be found that even by very prudent management they can hardly escape loss instead of making profit. Illustrations of the exceptions to this general rule in the cases of improperly subjecting the estate to the risks of trade and disregarding a direction to accumulate a fund are found in the following cases: *Ratcliff* vs. *Greaves*, Vernon, 186; *Raphard* vs. *Boehn*, 11 Ves., 92; *Durnford* vs. *Durnford*, 12 Ves., 127; *Scheeferlin* vs. *Steward*, 1 Johns. Ch., 619; *Edmunds* vs. *Crenshaw*, 1 Harp. Eq., 224.

The results of the rule in question are clearly presented in *Huggins* vs. *Blakeley*, 9 Rich. Eq., 403. That mere neglect on the

part of a trustee to account does not constitute an exception to the general rule appears in *Rock* vs. *Hart,* 11 Ves , 58. The rule above stated does not appear since to have been questioned. It is true that at best it only affords an approximate means of adjusting a trustee's account. The proper duty of a trustee is to keep a separate account of trust funds in his hands, whether forming originally part of the trust estate as arising from accumulations. If such an account is presented for settlement there is nothing in the adjudicated cases requiring that the actual amount should be set aside and resort had to a rule merely approximating the truth of the settlement Such a rule is necessarily imperfect, and if it is attempted to bend it to conform to all the exigencies that arise it will lose its simplicity, that constitutes its chief element of value. In the present case there is nothing to take it out of the general rule that allows only simple interest. It does not appear that any payments out of the fund have been made which ought to have been made out of balances of interest, and therefore the qualification of the rule as it respects current payments is inapplicable to the case. The decree should be modified so as to allow only simple interest. It is clearly settled that, as a general rule, interest on funds received should only be computed from the first day of January next ensuing their receipt.—*Adams* vs. *Latham,* 14 Rich. Eq., 304. There are no special circumstances in the present case calling for a departure from this general rule, and interest should begin from the 1st of January next succeeding the receipt by the trustee of the trust funds.

The cause should be remanded to the Circuit Court for a modification of the decree as affecting the liability of Wells and his surety for the trust estate, in accordance with the foregoing principles.

*Wright,* A. J., concurred.

# STATEMENT.

To fully understand the cases which follow, and which grew out of the general election held in this State on Tuesday, the 7th day of November, 1876, it is necessary to state briefly some of the provisions of the law under which the election was held and the votes canvassed, and such general historical facts as bore upon the points raised and were unquestioned and unquestionable.

By the Constitution and law of the State, the election at each precinct within the County was to be held on the first Tuesday in November by three Managers of Election appointed by a Board of Commissioners of Election.

The voting was to be by ballot, and the Commissioners of Election were required to provide boxes for the Managers appropriately labeled. The Managers were required to keep a poll list, on which the name of each elector voting should be entered.

The polls were to be kept open from 6 A. M. to 6 P. M., and at the close of the polls the Managers were required to count the ballots and within three days to return to the Commissioners of Election the poll list and the boxes containing the ballots.

The Commissioners of Election were required to meet at the County seat on the Tuesday next following the election and organize as a County Board of Canvassers, and within ten days of the time of their first meeting the Board of County Canvassers were to make such statements of the votes "as the nature of the election required," and to transmit to the Board of State Canvassers any protests and all papers relating to the election. Duplicate statements were to be made out and filed in the office of the Clerk of the County, and if there be no such Clerk then in the office of the Secretary of State.

Besides the statements to be filed in the office of County Clerk or Secretary of State, three separate statements of the votes, containing the names of the persons voted for and the number of votes cast for each, were to be made out and transmitted by mail to the Governor, Secretary of State and Comptroller-General.

The Secretary of State, Comptroller General, Attorney General, State Treasurer, Adjutant and Inspector General and the Chairman of the Committee on Privileges and Elections of the House of Representatives were to constitute the Board of State Canvassers, four of whom were sufficient to constitute a Board.

At the times herein mentioned this Board consisted of five persons—H. E. Hayne, Secretary of State; F. L. Cardozo, State Treasurer; T. C. Dunn, Comptroller General; William Stone, Attorney General, and H. W. Purvis, Adjutant and Inspector General. Three of these persons, Hayne, Cardozo and Dunn, constituting a majority of the Board, were candidates for re-election.

The duties of the Board, as prescribed by the statute, were to meet, under the call of the Secretary of State, on or before the 10th of November next after the general election, "for the purpose of canvassing the votes for all officers voted for at such election."

The Board when formed "shall, upon the certified copies of the statements made by the Board of County Canvassers, proceed to make a statement of the whole number of votes given at such election for the various officers and for each of them voted for, distinguishing the several Counties in which they were given." They shall certify such statements to be correct and subscribe the same with their proper name. "They shall make and subscribe on the proper statement a certificate of their determination and shall deliver the same to the Secretary of State."

"Upon such statements they shall then proceed to determine and declare what persons have been, by the greatest number of votes, duly elected to such offices, or either of them. They shall have power, and it is made their duty, to decide all cases under protest or contest that may arise when the power to do so does not by the Constitution reside in some other body." The Board had power to adjourn from day to day "for a term not exceeding ten days."

The law further provided "that in case of a contest of the election for Governor, (if the General Assembly by concurrent resolution shall entertain the same,) that the Senate and House of Representatives shall, each separately, proceed to hear and determine the facts in the case so far as they deem necessary, and decide thereon who, according to the 10th Section of Article VIII of the Constitution, is entitled to be declared elected."

The Section of Article VIII of the Constitution referred to is in these words: "In all elections held by the people under this Constitution, the person or persons who shall receive the highest number of votes shall be declared elected."

This was a general provision, embracing not only the election for Governor, but also the election for other State officers, for members of the Legislature and for Presidential electors.

The Constitution also provided (Article II, Section 14,) that "each house shall judge of the election returns and qualifications of its own members."

In 1876 the State was divided into two political parties, one known as the Democratic and the other as the Republican party. The Democratic party was composed almost entirely of the native white citizens of the State, and the Republican party was composed of the black and colored citizens of the State, black and white citizens from Northern States who had come South since the war, and a few native and adopted white citizens of the State.

At the election held November 7, 1876, both parties had full tickets in the field. The candidates of the Democratic party on the State ticket were Wade Hampton for Governor; W. D. Simpson for Lieutenant Governor; R. M. Sims for Secretary of State; S. L. Leaphart for State Treasurer; Johnson Hagood for Comptroller General; James Conner for Attorney General; Hugh S. Thompson for Superintendent of Education, and E. W. Moise for Adjutant and Inspector General; and on the ticket for Presidential electors were Theodore G. Barker, Samuel McGowan, J. S. Ingram, Robert Aldrich, John W. W. Harrington, William Wallace and J. B. Erwin.

The candidates of the Republican party on the State ticket were D. H. Chamberlain for Governor; R. H. Gleaves for Lieutenant Governor; H. E. Hayne for Secretary of State; F. L. Cardozo for State Treasurer; Thomas C. Dunn for Comptroller General; R. B. Elliott for Attorney General; J. B. Tolbert for Superintendent of Education, and James Kennedy for Adjutant and Inspector General; and on their ticket for Presidential electors were C. C. Bowen, Timothy Hurley, John Winsmith, Thomas B. Johnston, William B Nash, Wilson Cooke and William F. Myers.

In every County of the State each party had a full ticket for members of the Legislature and for County officers. The election for members of Congress was held at the same time, and in the five Congressional Districts of the State each party had its nominee on the ticket.

The Republican party had been in the ascendant since 1867, carrying every general election in which there was any contest by majorities amounting to over thirty thousand, and a large majority of both branches of the Legislature had been members of that party. A strong conviction, however, had taken hold of the minds of many of the most intelligent, well informed and influential citizens of the State that at the general election to take place in that year (1876) the Democratic ticket would be successful. Owing to causes unnecessary to be here mentioned, the most intense excitement prevailed. The election, however, was peaceable. There was no violence or bloodshed anywhere at the polls, and but few if any disturbances took place.

The polls were closed on Tuesday, November the 7th, at 6 o'clock P. M., and very soon thereafter it became known that, according to the returns or statements of the County Boards of Canvassers for the different Counties of the State, Hampton had certainly received a majority of the votes for Governor. It was also believed that the other candidates on the Democratic State ticket were elected; but as to the Presidential electors there was great uncertainty, the chances apparently being that the Republican ticket had received a majority.

As to the election in the different Counties for members of the Legislature, it also soon became known that, according to the returns or statements of the County Boards of Canvassers of the different Counties, the Democratic party had elected a majority of the members of the House of Representatives; but the elections in the respective Counties of Edgefield, Laurens and Barnwell, in which the Democratic candidates had the majorities, were contested, and it was feared and believed by many that the members of the Board of State Canvassers would assume judicial powers and give the certificates of election for those Counties to the Republican candidates and thus give to that party the control of the organization of the House.

. It was also feared and believed by many that the State Board of Canvassers would set aside, disregard or ignore the returns or statements of the County Boards of Canvassers for those Counties of the election for Governor and Lieutenant Governor and the State ticket generally, and thus give a majority to D. H. Chamberlain and the other Republican candidates.

These fears and beliefs grew out of the fact not only that all the members of the State Board of Canvassers were members of the Republican party, but also that three out of the five persons composing that Board were candidates for re-election upon the Republican State ticket. It was manifest, therefore, that if they assumed judicial powers and undertook to decide which of the candidates for members of the House from those Counties were entitled *prima facie* to the certificates of election, and also to decide on the returns or statements of the County Boards of Canvassers of those Counties as to the validity of the election for State officers, they would be acting as judges in their own cause. And it may be as well to add here that, this objection having been brought to the notice of the Board in a protest against their exercising any other than ministerial powers, they passed resolutions declaring that they did not propose to canvass the returns of Governor and Lieutenant Governor; that as the State Board of Canvassers they had the right to hear protests as to the election of electors for President and Vice President and members of Congress, and to give their certificates to such persons as had the highest number of votes; and, lastly, " that it is the opinion of the Board of State Canvassers that the Secretary of State, State Treasurer and Comptroller General have the right to sit as members of this Board to hear and determine all questions coming before them, except that neither of the said officers shall vote upon his own election."

Such was the political state of affairs in the State immediately preceding the commencement of the action in *Wallace* vs. *Hayne* and the other political cases which followed that case.